[No. H003586. Sixth Dist. Mar. 6, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
DOUGLAS EUGENE WILSON, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I(B), I(C) and II.

COUNSEL

Harvey R. Zall, State Public Defender, under appointment by the Court of Appeal, and Kent Barkhurst, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Gerald A. Engler and Violet M. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SILVER, J.*—Following a jury trial, defendant Douglas Eugene Wilson was convicted of first degree burglary (Pen. Code[1], §§ 459, 460, subd. (1)). In a bifurcated proceeding, the trial court found true allegations that defendant had previously been convicted of a serious felony (§§ 667, 1192.7) and had served a prior prison term (§ 667.5, subd. (b)). Defendant received a prison term of 10 years. On appeal, he asserts instructional and sentencing error. For reasons explained below, we affirm.

BACKGROUND

On April 17, 1986, Jack Boren was renting a bedroom in a home on Galen Drive in San Jose. The house contained four bedrooms, each of which was equipped with a lock and key. Between 11 a.m. and noon, Boren left the house after locking his bedroom door. When he returned around 2 p.m., he discovered that nine weapons from his gun collection were missing. One of the missing guns was an Uzi semiautomatic carbine. Also missing were a camera, binoculars, some coins and jewelry. There were no signs of forced entry into the residence itself. However, police investigators found defendant's fingerprint near pry marks on Boren's bedroom door.

On April 20th, Los Angeles police officers received a report of a man, later identified as defendant, carrying an Uzi machine gun on Hollywood Boulevard. When officers arrived at the scene, defendant attempted to dispose of a yellow bag he was carrying. Inside the bag, officers discovered a silencer and five of the guns stolen from Boren's room.[2] Among these was the Uzi, which had been converted to a fully automatic weapon and had a barrel less than 16 inches in length. Other items belonging to Boren were also discovered in defendant's possession. The April 20th incident gave rise to a federal prosecution for possession of unregistered weapons. (See 26 U.S.C. § 5861(d).)

Boren testified that he had seen defendant at the Galen residence about a month or two before the burglary in the company of the landlady's son, Doug Orton. Orton, who had a key to the front door, had been in Boren's room on a couple of occasions and had seen the victim's gun collection.

At trial, defendant testified that he first met Orton at Sambo's diner in the early morning hours of April 17, 1986. Orton told him that Boren had some weapons for sale. He showed defendant photographs of the weapons and

---

* Assigned by the Chairperson of the Judicial Council.
[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] The silencer did not belong to Boren.

they agreed on a price of $4,000. Thereafter, defendant and Orton went to the house on Galen where they were admitted by another boarder. Defendant waited in the house while Orton did some laundry. During this period, he tried several doors, including the locked door to Boren's room, while searching for the bathroom.

After the other boarder left the house, Orton took defendant to the garage where the weapons were located. They completed the sale and placed the weapons in the trunk of Orton's car. Thereafter, Orton drove defendant to Los Angeles.

At trial, the People relied on two theories with respect to the underlying offense: (1) that the burglary occurred when defendant entered Boren's room with an intent to steal his weapons; and/or (2) that defendant, an aider and abettor, went to the Galen residence with Orton, who had knowledge of the guns, with the intent to steal the weapons.

### DISCUSSION

### I. *Instructional Error*

#### A. First Degree Burglary

Section 460 defines first degree burglary as follows: "Every burglary of an inhabited dwelling house . . . or the inhabited portion of any other building, is burglary of the first degree."

In the instant case, the court instructed the jury on the distinction between first and second degree burglary as follows: "There are two degrees of burglary. Every burglary of an inhabited portion of any building is burglary of the first degree. A burglary which is not of the first degree is burglary of the second degree. [¶] "An inhabited dwelling house or any portion thereof is a structure which is occupied and customarily used as a dwelling. . . ." (See CALJIC Nos. 14.51, 14.52.)

Defendant contends the giving of this instruction was error because "under section 460, when a person is inside an inhabited dwelling house, entry into any other room in that house [in this case, Boren's bedroom] for whatever purpose does not constitute first degree burglary." Thus, defendant asserts that if he formed the intent to steal after he entered the main residence, he could not be found guilty of first degree burglary based on the subsequent entry into Boren's room. In support of his argument, defendant cites the Legislature's use of the words "other building" in section 460, by which, he contends, the Legislature distinguished "between the inhabited

portions of inhabited dwellings and the inhabited portions of *other* buildings."

██ "The fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citation.] In addition, statutes must be construed so as to give a reasonable and common-sense construction consistent with the apparent purpose and intention of the lawmakers—a construction that is practical rather than technical, and will lead to wise policy rather than mischief or absurdity. [Citation.] In approaching this task, the courts may consider the consequences which might flow from a particular interpretation and must construe the statute with a view to promoting rather than defeating its general purpose and the policy behind it. [Citation.]" (*People* v. *Martinsen* (1987) 193 Cal.App.3d 843, 848 [238 Cal.Rptr. 530].) ██ Application of these principles persuades us that the Legislature did not intend to exclude a lodger's room from the provisions of section 460 simply because that room happens to be located within a house as opposed to some other type of inhabited building.

██ As the People correctly point out, the Legislature's distinction between first and second degree burglary is founded upon the risk of personal injury involved. "Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation . . . . The laws are primarily designed, . . . to forestall the germination of a situation dangerous to personal safety; *and thus the higher degree of the burglary law is intended to prevent those situations which are most dangerous, most likely to cause personal injury.*" (*People* v. *Lewis* (1969) 274 Cal.App.2d 912, 920 [79 Cal.Rptr. 650], italics added; accord *People* v. *Nible* (1988) 200 Cal.App.3d 838, 844 [246 Cal.Rptr. 119]; *People* v. *Parker* (1985) 175 Cal.App.3d 818, 823 [223 Cal.Rptr. 284].) Accordingly, various structures, including apartments and hotel rooms, have been held to fall within the definition of an "inhabited dwelling" (see, e.g., *People* v. *Zelaya* (1987) 194 Cal.App.3d 73, 75 [239 Cal.Rptr. 289]; *People* v. *Fleetwood* (1985) 171 Cal.App.3d 982, 987-988 [217 Cal.Rptr. 612]), and appellate courts have traditionally analyzed first degree burglary "in terms of whether the dwelling was being used as a residence. [Citations.]" (*People* v. *Deay* (1987) 194 Cal.App.3d 280, 284 [239 Cal.Rptr. 406].)

██ Defendant acknowledges the purpose of the first degree burglary statute, but argues there was little likelihood that a confrontation would result from his entry into Boren's room "since it was obvious he was not home." As the Attorney General suggests, this argument flies in the face of reason. Boren's bedroom door was secured by a lock which could be operated either by a key from outside the room or by an inside knob. Defendant

had no way of knowing whether or not Boren was in his room and the likelihood of a dangerous confrontation was no less than that occasioned by an unauthorized intrusion into the residence itself. Whether a burglary is of the first or second degree is not dependent on the belief of the burglar that the residence is *actually* occupied at the time of entry but rather on whether the dwelling is the usual abode of a person irrespective of whether he or she happens to be home at the time of the illegal entry. (See *People* v. *Cardona* (1983) 142 Cal.App.3d 481, 483 [191 Cal.Rptr. 109]; § 459.) ▮ Were we to exclude Boren's rented room from the ambit of section 460, we would frustrate the intent of the Legislature to protect citizens from the dangers attendant on the burglary of an inhabited residence. This would lead to absurd results and unwise policy. Given the fact that the Galen residence was being operated as a boarding house, and that each rented room was equipped with a lock and key, we hold that Boren's rented room was a separate residence which falls within the purview of section 460.

I (B)*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

III.   *Disposition*

The judgment is affirmed.

Brauer, Acting P. J., and Elia, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 7, 1989.

---

* See footnote, *ante,* page 611.